# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* ESTATE OF LARRY E. HUTCHINSON
LIVING TRUST.

---

THOMAS AMOR, Personal Representative of the
ESTATE OF JOY HUTCHINSON,

     Appellant,

v

KAREN SCHMOKE, KARLA FRENCHI,
KAROL KROUPA, KRISTEN WILHELM and
KELLY GILMAN,

     Appellees.

UNPUBLISHED
July 7, 2016

No. 326411
Manistee Probate Court
LC No. 13-000089-TV

---

Before: GLEICHER, P.J., and SAWYER and M. J. KELLY, JJ.

GLEICHER, P.J. (*dissenting*).

This probate dispute concerns the ownership of overlooked oil, gas and mineral rights. The rights initially resided in the Joy E. Hutchinson Trust. The trust terminated according to a settlement agreement signed by Joy E. Hutchinson and the five daughters of Joy's late husband, Larry E. Hutchinson. The parties intended this agreement to distribute all trust assets. But the oil, gas and mineral rights escaped the attorneys' attention when they wrapped up paperwork. The question of their ownership bubbled to the surface years later, after Joy died.

The majority affirms the probate court's decision to award the contested rights to the daughters rather than to Joy's estate. Because this distribution conflicts with the terms of the settlement agreement, I respectfully dissent.

I

Larry E. Hutchinson created a revocable living trust and funded it with real and personal property. The trust's real property consisted of a family farm with a homestead and surrounding acreage. Larry's personal property included farm equipment and personal things, such as cars and insurance policies. Larry named Joy as his trust's primary beneficiary and its successor trustee.

-1-

When Larry died, the corpus of his trust transferred to the Joy E. Hutchinson Trust, which Larry's trust had created for Joy's benefit during her lifetime. The terms of Joy's trust tasked her with distributing the farm equipment to Larry's five daughters by an earlier marriage. All other personal property in Larry's trust went to Joy, as did the "net income" of the trust—presumably, this would include any profits from the sale of gas, oil and mineral rights. And the trust allocated all real estate owned by Larry's trust to Joy's trust.

Larry's trust permitted Joy's trust to sell any of the real estate as needed for her support and maintenance, on condition that Joy (acting as trustee) first offer Larry's children an opportunity to purchase it. "If an offer has been received from a third party," the trust required Joy to afford the daughters 30 days' written notice "to indicate their desire to purchase." If there were no takers and Joy's trust sold the property, Larry's trust dictated that "the proceeds of sale shall be held in a separate account in the name of the trust and shall not be commingled with other funds." Joy was permitted to distribute "part or all of the trust corpus" to herself for any of several reasons, including to "[p]rovide extra funds for the beneficiary's well-being and comfort." On Joy's death, any remaining funds were to be divided equally among Larry's daughters.

After Larry died, Joy sold the farm equipment and pocketed the yield (approximately $27,000), contrary to the terms of Larry's trust. Years later, Larry's daughters discovered this malfeasance and petitioned to remove Joy as trustee of her trust. The daughters further complained that Joy had burdened the real property with loans and made arrangements to sell some of it without properly informing them.

The parties resolved this dispute by entering into a stipulated settlement order divvying up the assets held in the Joy E. Hutchinson Trust. They first divided the real estate into two portions: the "Family Farm" and "Woodland" parcels.[1] The settlement order provided that Joy's trust would sell the 40-acre "Family Farm" parcel according to the terms of a purchase agreement referenced by and attached to the order. The purchase agreement recited that "Joy Hutchinson, not individually, but as Trustee of the Joy E. Hutchinson Trust under the Larry E. Hutchinson Living Trust" agreed to sell the real estate we have referred to as the "Family Farm," "excluding all oil, gas, and mineral interests," for $275,000. When that sale was accomplished, the settlement agreement required Joy as trustee to pay $30,000 to the law firm representing Larry's daughters. Joy received "[a]ll remaining proceeds of the Family Farm sale, less the expenses of transferring the Woodland Property[.]" In other words, Joy got the value of the family farm sale, less $30,000 and some likely minimal incidental costs.

The settlement order further stipulated that when the Family Farm sale consummated, Joy would convey the Woodland property to Larry's five daughters pursuant to a trustee's deed. Her trust purchased a title policy for the property in the amount of $87,500. Paragraphs 7 and 8 of the settlement document stated as follows:

---

[1] Some documents of record refer to the "Family Farm" parcel as the "Family Cabin" parcel.

7.      Contemporaneously with the closing of the sale of the Family Farm, the parties shall execute a mutual all claims release . . . and shall cause their respective counsel to execute a dismissal of the petitions filed in this matter.

8.      Upon the distributions set forth herein, the Trust terminate, and consistent with the Release of All Claims at Exhibit C, Joy Hutchinson is released in her individual and trustee capacity from any liability [of] any kind to [Larry's five daughters].

The land transferred hands as agreed. But no one prepared a deed transferring the oil, gas, and mineral interests to Joy (or to anyone else, for that matter). Then the parties and their lawyers terminated Joy's trust, or thought they did. When Joy died, the personal representative of her estate petitioned to reopen the proceedings so that he could transfer the subsurface rights to Joy's estate. The probate court ultimately awarded the rights to Larry's daughters, and the majority affirms.

## II

The majority's analysis hinges on its conclusion that "because the parties' Settlement Agreement did not terminate the Trust, the probate court did not err by looking to the Trust for the limited purpose of distributing the Family Farm's mineral rights—the sole remaining material purpose of the Trust." I concur that the trust remained open due to the parties' failure to transfer the mineral rights out of the trust. In my view, however, the settlement agreement controls, not the trust, as the former superseded the latter. The settlement agreement provides that all property once in Larry's trust, but for the Woodland acreage and the $30,000 in legal fees, belonged to Joy.[2]

The terms of the settlement agreement differ markedly from the terms of Larry's trust. Indeed, the parties essentially discarded the terms of Larry's trust when they resolved their differences regarding Joy's management of the trust assets. In so doing, they adopted the property allocation set forth in the settlement agreement rather than in the trust. Given their stipulation to set aside the trust provisions, the probate court erred by relying on the terms of a document that no longer mattered, as the parties had forged a new and alternative agreement. In broad context, that agreement carved the Hutchinson land into two pieces, one for Joy to use or sell as she wished, and one for the daughters. Reading the document in that spirit leads to the conclusion that had the paperwork been timely drafted, Joy would have owned the subsurface rights.

Despite the lawyers' oversight, the settlement signers' intent is clear. Joy got everything related to the family farm property less $30,000, and the daughters got the Woodland property.

---

[2] Even if the trust still controlled, a good argument could be made that Joy was entitled to the oil, gas and mineral rights, as both Larry's and Joy's trusts specifically allocated to Joy individually any "income" flowing from her trust. Indeed, the purpose of Larry's trust was to provide income to Joy.

Nothing in the settlement agreement hints that Larry's daughters would be entitled to any subsurface or other rights related to the family farm property. The stipulated order specifically referenced the real estate purchase agreement, which in turn specifically called out the reserved mineral rights. If the parties truly intended those rights to go to the daughters, I cannot fathom why the daughters did not insist on title right then and there.

Nor am I persuaded by the majority's dictionary-driven attempt to cabin the term "proceeds" in paragraph four of the settlement agreement to the cash generated by the sale of the family farm. By way of reminder, paragraph four allocated to Joy individually "[a]ll remaining proceeds of the Family Farm sale, less the expenses of transferring the Woodland Property[.]" When Joy sold the farm and the land around it, she made a deal with the buyers. That deal allowed her to sever and retain the oil, gas and mineral rights, most likely in exchange for a reduction in the purchase price. She realized two types of value from the deal: cash and mineral rights. The buyers got the house and the land. Her take seems like "proceeds" to me.

Respectfully, the majority has drilled too deeply in the dictionary. "Proceeds," the majority declares with reference to *Black's Law Dictionary*, means something "derived from a 'sale,' which connotes the exchange of one thing of value for another." "The mineral rights existed before the sale," the majority proclaims, and so "the severance of those rights from the Family Farm's surface rights cannot reasonably be characterized as consideration for the property purchased, i.e., a 'proceed.'" But this is far too narrow an interpretation of both "proceeds" and the family farm transaction.

Outside the pages of *Black's Law Dictionary*, the word "proceeds" has a more flexible and expansive meaning. "It is a 'word of varied significance and employed with different meanings.'" *Riverside Healthcare Ass'n, Inc v Forbes*, 281 Va 522, 530; 709 SE2d 156 (2011) (citation omitted). In the context of the family farm sale, Joy's trust emerged with two things of value: money and gas, oil, and mineral rights. The settlement agreement awarded the money to Joy. Like the money paid for the farm, the oil, gas, and mineral rights were a bargained-for commodity of the sale, as reflected in the purchase agreement. In my view, both the cash and the rights were "proceeds" of the sale when paragraph four is interpreted in conjunction with the surrounding apportionments.

Two examples come to mind. If Joy had sold the family farm property but kept an outbuilding for her own use, would not the outbuilding be a "proceed" of the sale that went to Joy? If she owed the buyer money and obtained debt forgiveness in exchange for the land, would not that forgiveness constitute a "proceed" accruing to Joy? As commonly understood, "proceeds" are things of value obtained through an exchange. The settlement agreement (supplemented by the purchase agreement) provided that the proceeds of the family farm sale included severed mineral rights, an economic benefit to the trust. Along with the rest of the assets in Joy's trust related to the family farm, I believe that the parties intended that this "proceed" belonged to Joy.

I would remand for entry of an order permitting Joy's personal representative to prepare a deed assigning Joy's estate the mineral rights. Alternatively, the probate court could conduct an evidentiary hearing aimed at determining the parties' intentions in this regard at the time they executed the settlement agreement. The latter course of action seems unnecessary to me, as the

settlement agreement explicitly encapsulates the parties' intent that Joy would receive all assets related to the farm.  But the benefit of convening a hearing is to place the focus where it belongs: on the settlement agreement rather than Larry's trust.  The majority's decision to look to the trust for guidance fundamentally contravenes the settlement agreement and the parties' objectives when they drafted it.  Accordingly, I dissent.

/s/ Elizabeth L. Gleicher